❏ Original

CLERK'S OFFICE
A TRUE COPY
Sep 17, 2020
s/ JeremyHeacox

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Information associated with Apple ID: oscar22ramirez@icloud.com | ) ) ) |

Case No.  **20-M-401 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ 10-1-20 _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.  ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Honorable Stephen C. Dries _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*  ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      9-17-20 6:15 pm                    *Stephen C. Dries*
                                                    *Judge's signature*

City and state:   Milwaukee, WI.                    Honorable Stephen C. Dries
                                                    *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with Apple IDs : **idtr_black@yahoo.com** and **oscar22ramirez@icloud.com** (the "account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

## ATTACHMENT B

### Particular Things to be Seized

## I.      Information to be disclosed by Apple

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all emails associated with the account from January 1, 2019, through September 17, 2020, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      The contents of all instant messages associated with the account January 1, 2019, through September 17, 2020, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and

2

query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

3

**II.     Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses involving Jonte MARSHALL, Lemonda WARD, Shomari HOOPER, and Oscar RAMIREZ-RIVERA since January 1, 2019, including, for each account or identifier listed on Attachment A, information pertaining to the following matters: the sale of illegal drugs and the laundering of proceeds of drug sales.

The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

a.     Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

b.     Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

c.     Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

d.     Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

4



CLERK'S OFFICE
A TRUE COPY
Sep 17, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )

Information associated with Apple ID: )
oscar22ramirez@icloud.com )

Case No. **20-M-401 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, USC, Sections 841(a)(1), 843(b) and 846, Title 18, USC Sections 1956 & 1957 | See attached affidavit |

The application is based on these facts:

See attached affidavit

❒ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW COOPER (Affiliate) <span style="font-size:smaller">Digitally signed by MATTHEW COOPER (Affiliate) Date: 2020.09.17 16:16:30 -05'00'</span>

*Applicant's signature*

Matthew Cooper, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 9-17-20 _____

*Judge's signature*

City and state: Milwaukee, WI.

Honorable Stephen C. Dries

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
APPLE IDs: **idtr_black@yahoo.com** and
**oscar22ramirez@icloud.com** THAT IS
STORED AT PREMISES CONTROLLED
BY APPLE, INC.

Case No. 20-M-401 (SCD)

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, Task Force Officer Matthew Cooper, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the above-listed Apple IDs that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA.  The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.      I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over 23 years.  I have been a Detective for over 17 years and have been assigned to conduct narcotics investigations for over 16 years.  I was previously assigned to the Vice Control Division (Narcotics) as a Police Officer for over 2 years.  I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 12 years.  I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since October, 2008.  As such, I am an investigative or law

enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.     I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a.     I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b.     I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c.     I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e.     I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f.     I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

2

g.      I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h.      I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

i.      I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

j.      I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

4.      I am currently participating in an investigation of a fentanyl trafficking organization led by Jonte MARSHALL, hereinafter referred to as the MARSHALL DTO. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (c) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein.[1] This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence that violations of Title 21, United

---

[1] Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

3

States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 1956 and 1957, as described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."

## PROBABLE CAUSE

7.     In April 2019, case agents met with a confidential source, hereinafter referred to as "CS-1."[2]   CS-1 provided information regarding suspects involved in drug trafficking in the Milwaukee, Wisconsin, area. CS-1 identified Jonte MARSHALL as a large-scale distributor of heroin, cocaine, and marijuana in the Milwaukee area. CS-1 identified one of MARSHALL's phone numbers as (414) 779-1998. CS-1 identified MARSHALL's residence as a duplex at 1929 and 1931 South 97th Street, West Allis, Wisconsin.   CS-1 stated this residence is a duplex owned by MARSHALL. MARSHALL lives in the lower unit of the duplex and stores drugs in the upper unit of the duplex.   CS-1 stated that MARSHALL carries a pistol on his person at all times.

8.     CS-1 believed that Jonte MARSHALL receives at least some of his drugs through the mail.  On one occasion, CS-1 was at the residence of MARSHALL's associate, Corey Vance,

---

[2] Case agents believe CS-1 is a reliable person because CS-1 has provided information which law enforcement has been able to corroborate through independent investigations, CS-1 has provided statements against CS-1's own penal interests, and CS-1 has conducted controlled buys of narcotics for law enforcement. CS-1's adult criminal history includes two misdemeanor convictions and one felony conviction. CS-1 is cooperating in exchange for consideration on a pending felony arrest and was paid $1,000 on two occasions for providing information on multiple felony offenses occurring in the Milwaukee area.

4

when a third subject was at the residence waiting to receive a parcel believed to contain drugs. CS-1 left the residence before the parcel arrived. CS-1 stated MARSHALL owns a residence in Arizona and travels to Arizona frequently to conduct drug trafficking activities.

9. CS-1 identified another subject involved in drug trafficking with Jonte MARSHALL as Corey Vance. CS-1 stated Vance distributes large amounts of heroin, cocaine, and marijuana for MARSHALL. CS-1 identified Vance's residence as 5908 North 69th Street, Milwaukee, Wisconsin. CS-1 stated Vance lives at this residence with his mother. CS-1 stated that within several days of the interview CS-1 had been inside this residence and seen five different handguns. CS-1 further stated that Vance always carries a handgun in his waistband. CS-1 stated Vance also stores drugs at this residence and observed about 100 grams of heroin in the residence about two weeks earlier.

10. CS-1 stated that when CS-1 would purchase heroin from Vance and MARSHALL, a girlfriend of MARSHALL's would arrive at the residence with the heroin. Vance would leave the residence with the money, meet with the unidentified girlfriend of MARSHALL, then return to the residence with the heroin. Despite CS-1's belief that MARSHALL and VANCE distribute heroin, all of the suspected "heroin" seized to date has tested positive for fentanyl rather than heroin.

### Controlled Purchases of Drugs from the Jonte MARSHALL DTO

11. On April 18, 2019, CS-1 placed a recorded and monitored call to Corey Vance. Vance answered the phone. CS-1 asked Vance about purchasing "50" the following day and asked if the transaction could take place at 11:00 a.m. or 12:00 p.m. Vance agreed and the call ended. Telephone records show that a short time later Vance called Jonte MARSHALL at (414) 779-1998. Case agents believe Vance called MARSHALL to relay CS-1's request to purchase drugs.

5

12.     On April 19, 2019, CS-1 exchanged a series of text messages with Vance. That morning, case agents established surveillance at the residence of Jonte MARSHALL, and at the residence of Corey Vance. CS-1 was given $3,000 in pre-recorded buy money and an audio recording and monitoring device. CS-1 received a text message from Vance which told CS-1 to come to Vance's residence to complete the transaction. At about the same time, case agents observed Jonte MARSHALL walk from the rear of his residence. MARSHALL entered the driver's seat of a black Cadillac Escalade and backed out of the driveway. The vehicle was not followed.

13.     CS-1 arrived at Vance's residence and went inside. A short time later, case agents observed MARSHALL's black Cadillac Escalade arrive and park near Vance's residence. A few minutes later, Vance exited his residence and entered the front passenger seat of the Escalade. Vance exited the Escalade about 20 seconds later and re-entered his residence. The Escalade then departed the area followed by several surveillance units.

14.     A short time later, CS-1 exited Vance's residence. CS-1 was followed directly to a pre-determined meet location. Upon arrival, CS-1 turned over to case agents a clear plastic, knotted baggie containing a tan, chunky substance suspected to be fentanyl. CS-1 stated that upon entering the residence, CS-1 met with Vance and handed the pre-recorded buy money to Vance. Vance placed a call and informed the person on the other end of the phone that CS-1 was "good." CS-1 waited in the residence for about 20 minutes with Vance. CS-1 further stated that at one point Vance received a text message and exited the residence. Less than a minute later, Vance returned to the residence and went into a back bedroom. A short time later, Vance returned to the living room and handed CS-1 the baggie containing the tan, chunky substance. Vance told CS-1 he had weighed the baggie and it weighed 50 grams. CS-1 then left the residence and returned to

6

the predetermined meet location. The suspected fentanyl later tested positive for fentanyl with a total weight of 51.62 grams.

15. Surveillance followed the Cadillac Escalade to a local BMO Harris Bank. MARSHALL exited the Escalade and entered the bank. Case agents later obtained surveillance video from the BMO Harris Bank branch. A review of the video showed MARSHALL enter the bank and meet with a bank teller. MARSHALL removed a large amount of United States currency from his pocket and deposited it into an unknown bank account.

16. Case agents have made nine additional controlled purchases of fentanyl from members of the Jonte MARSHALL DTO. From May 8, 2019, through September 26, 2019, CS-1 purchased an additional 450 grams of fentanyl from Corey Vance and Jonte MARSHALL. MARSHALL was in regular phone contact with Vance surrounding each of these transactions. During surveillance of several of the controlled buys, case agents observed Lemonda WARD deliver the fentanyl to Corey Vance prior to Vance delivering it to CS-1. Therefore case agents believe Lemonda WARD is a courier for the MARSHALL DTO. On October 11, 2019, Corey Vance died of natural causes. CS-1 attended a funeral service for Vance and met with Jonte MARSHALL. MARSHALL directed CS-1 to start purchasing fentanyl from Shomari HOOPER. CS-1 agreed.

17. In November 2019, CS-1 purchased approximately 50 grams of fentanyl from Shomari HOOPER at HOOPER's residence. In February 2020, CS-1 purchased approximately 50 grams of fentanyl from HOOPER at HOOPER's residence. In April 2020, CS-1 purchased approximately 100 grams of fentanyl from HOOPER at HOOPER's residence. Lemonda WARD delivered the fentanyl to HOOPER prior to HOOPER's transaction with CS-1.

7

18.     On June 21, 2020, CS-1 contacted HOOPER and requested to purchase more fentanyl in the following days. HOOPER agreed. During the afternoon of June 22, 2020, CS-1 and HOOPER exchanged a series of phone calls and text messages in which CS-1 requested to purchase the drugs that afternoon. HOOPER told CS-1 he would let CS-1 know when the drugs were available. Case agents later reviewed video from a remote surveillance camera installed to monitor the alley behind HOOPER's residence. On June 22, 2020, at 5:35 p.m., the black Cadillac Escalade known to be driven by Jonte MARSHALL drove north in the alley and stopped behind HOOPER's residence. MARSHALL exited the vehicle and removed a cardboard box which he then handed to HOOPER. HOOPER carried the box toward the residence and MARSHALL entered the vehicle. At 5:39 p.m., MARSHALL exited the vehicle holding a white plastic bag which contained a weighted object the size of a large loaf of bread. MARSHALL stood outside the vehicle with the bag. HOOPER then emerged from behind the garage behind the residence. MARSHALL handed HOOPER the white plastic bag and HOOPER handed MARSHALL a black suitcase or bag which MARSHALL placed into the backseat of the Escalade using both hands. MARSHALL and HOOPER continued to talk for several minutes before MARSHALL drove the Escalade away and HOOPER walked back toward the residence carrying the white plastic bag. Case agents believe the plastic bag contained a quantity of fentanyl and the black bag contained money as payment for drugs previously received on consignment. Later that evening, CS-1 contacted HOOPER via text message and asked if the transaction could be completed the following day. HOOPER replied with two "thumbs up" emoji, indicating the transaction would take place the next day. The following day, June 23, 2020, CS-1 purchased approximately 100 grams of fentanyl from HOOPER behind HOOPER's residence. During each of the controlled buys from HOOPER, CS-1 was equipped with an audio monitoring device.

8

19.     Telephone records have revealed that during many of these transactions, data sessions had been opened on MARSHALL's and/or WARD's phone.  Case agents are aware that data sessions are opened when the user of a cellular phone is utilizing the cellular network to send or receive data, including communications sent through the use of alternate communication platforms.  There have been numerous instances of physical and electronic surveillance when Jonte MARSHALL and Lemonda WARD have been observed meeting with each other and/or other suspected members of the MARSHALL DTO, but there has not been a phone call preceding these meetings.  Case agents believe that MARSHALL and WARD are using a communication platform to communicate with each other and with other DTO members.  Case agents are further aware that Apple FaceTime is a communication platform frequently used by drug traffickers to communicate with each other and that the use of Apple FaceTime would cause a data session to be utilized on the user's cellular phone.

20.     Additionally, a review of telephone records has revealed that during the controlled purchases of fentanyl from Shomari HOOPER, many of the text messages sent from CS-1 to HOOPER did not appear in HOOPER's phone records despite case agents being with CS-1 at the time the text messages were sent.  This leads case agents to believe that these messages were sent via Apple's iMessage rather than as conventional text messages.  Case agents further believe that HOOPER uses iMessage to communicate with MARSHALL and WARD.

21.     On March 20, 2020, a United States Postal Inspector was conducting routine parcel screening at the United States Postal Service ("USPS") Root River Post Office, located at 11015 W Oklahoma Avenue, Milwaukee, Wisconsin 53227, when the following parcel was found to be suspicious in nature: USPS Priority Mail parcel 9405503699300286995365.   The parcel was approximately an 11.25" x 8.75" x 6" USPS medium flat rate Priority Mail parcel weighing

9

approximately 5 lbs. 8 oz. The parcel's label indicated it was from "The Variety Shoppe, PO Box 315, Dawsonville GA 30534-0006." The parcel bore a typewritten label addressed to "Jonte Marshall, 1929 S 97th St, West Allis WI 53227-1430." The parcel was postmarked on March 18, 2020, in Dawsonville, Georgia 30534. The postage paid was $15.05.

22.    The sender of the parcel, The Variety Shoppe, has a website, www.varietyshoppe.com, showing a number of products they sell including digital scales, detox products, sexual stimulants, room deodorizers, and "powdered vitamins." Their homepage shows the "top selling powdered vitamin supplements" as mannitol, inositol, niacinamide, lactose, and VitaBlend. Case agents are aware mannitol, inositol, and lactose are common cutting agents added to narcotics prior to distribution. The website further states, "our customers receive an e-mail after the order is shipped containing an estimated time of arrival and a tracking number for the order."

23.    A check of USPS business records showed that since June 2018 the destination address of the parcel, 1929 South 97th Street, has received 32 packages originating from Dawsonville, Georgia. The last ten of these packages have all been from the same sender address as the parcel sent on March 18, 2020, and have all shown the same approximate weight as the this parcel. The USPS business records were not kept for the remaining 20 parcels. Postal Inspectors were unable to confirm the sender name and address of these parcels, but suspects they all originated from the Variety Shoppe due to the type of USPS shipment used, the originating Post Office, and the weight of the parcels being the same as the this parcel.

24.    On March 20, 2020, case agents applied for and received a federal sneak and peek search warrant for the parcel. The search warrant was issued by United States Magistrate Judge Nancy Joseph in the Eastern District of Wisconsin. Upon executing the search warrant on the parcel on March 20, 2020, case agents discovered the parcel contained two containers of Seven

10

Stars Superior Lactose in powder form. The label for each container showed they each contained "2.2 lbs/1000 grams" of lactose. The parcel also contained a packing slip which showed the order was taken by The Variety Shoppe from Jonte MARSHALL with an email address of ldtr_black@yahoo.com.[3] Case agents repackaged the parcel with all of its original contents and placed it back into the mail stream. The parcel was delivered on March 21, 2020, at approximately 10:41 a.m.

25. On September 30, 2019, a Grand Jury subpoena was served on Apple for information related to (414) 779-1998, the cellular phone used by Jonte MARSHALL. On October 10, 2019, case agents received a response from Apple. The response identified the Apple ID associated with (414) 779-1998 as **idtr_black@yahoo.com**. The Apple response further identified Jonte MARSHALL's email address as idtr_black@yahoo.com.

26. On May 12, 2020, the Honorable William E. Duffin, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the Apple ID idtr_black@yahoo.com. Case agents subsequently served that warrant on Apple. On May 29, 2020, case agents received a response from Apple. As detailed below, information received from Apple revealed that MARSHALL, using (414) 779-1998, was in regular contact with a subject later identified as Oscar RAMIREZ-RIVERA. Case agents believe, based on the investigation to date, that RAMIREZ-RIVERA is a fentanyl source of supply to MARSHALL and that MARSHALL sends money to Arizona as payment for fentanyl received from RAMIREZ-RIVERA.

---

[3] Case agents believe this particular order contained a typo of MARSHALL's actual email address where the first letter, "i" was changed to an "l."

27.     The Apple response showed that from January 29, 2018, at 8:45 p.m.[4], through July 12, 2019, MARSHALL, using (414) 779-1998, exchanged numerous iMessages with (602) 391-0291, an Arizona phone number.  Many of these messages requested simply that one party call the other one.  Both MARSHALL and the user of (602) 391-0291 referred to each other as "Mano." On February 13, 2018, at 7:55 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to (602) 391-0291 that read, "Text me your full name here."  On February 13, 2018, at 7:58 p.m., the user of (602) 391-0291 sent an iMessage back to MARSHALL at (414) 779-1998 that read, "Oscar Manuel Ramirez Rivera."  On February 10, 2019, at 12:52 a.m., the user of (602) 391-0291 sent an iMessage to MARSHALL at (414) 779-1998.  The iMessage contained a photograph of a State of Washington Identification Card in the name of Oscar Manuel RAMIREZ-RIVERA.  The card listed an address in Yakima, Washington.  On February 10, 2019, at 12:53 a.m., MARSHALL, using (414) 779-1998, sent an iMessage back to (602) 391-0291 that read, "CONGRATULATIONS U FUCKIN AMERICAN!!! Lol!!."  On February 10, 2019, at 12:54 p.m., the user of (602) 391-0291 sent an iMessage to MARSHALL at (414) 779-1998 that read, "I wish."  Case agents believe that RAMIREZ-RIVERA sent MARSHALL a photo of an identification card he had been issued.  MARSHALL joked that RAMIREZ-RIVERA was now an American citizen.  Case agents believe that Oscar Manuel RAMIREZ-RIVERA was the user of (602) 391-0291.  The Apple responses further revealed instances dating back to 2016 of Oscar RAMIREZ-RIVERA's name being sent by MARSHALL, using (414) 779-1998, to others with

---

[4] All times referenced in the Apple information are in UTC time.  Milwaukee, Wisconsin is five hours behind UTC times during daylight savings hours and six hours behind UTC during standard time.

directions to send wire transfers to or make deposits into bank accounts utilized by RAMIREZ-RIVERA.

28.      On April 29, 2019, at 4:28 a.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at (414) 779-1998 containing a screenshot of the Cash App application. Cash App allows users to send money directly to each other without using a bank or telegram service. The screenshot contained the name "Luis Alberto Molina" and the username "$molinalui." Case agents believe this was a request by RAMIREZ-RIVERA for MARSHALL to send money to "Luis Alberto Molina." On April 30, 2019, at 9:44 p.m., MARSHALL, using (414) 779-1998, sent an iMessage containing a screenshot from Cash App to RAMIREZ-RIVERA at (602) 391-0291 that contained a message that read, "Cash couldn't be sent. This would exceed your $7,500/week limit." Case agents believe MARSHALL had attempted to send money to "Luis Alberto Molina," but the transaction was denied. On April 30, 2019, at 9:45 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 302-0291 that read, "Maybe $25 right now?" On April 30, 2019, at 9:48 p.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at (414) 779-1998 that read, "Can you send it the old way for Friday Mano we have no more food in the fridge." Case agents believe MARSHALL offered to send "$25," possibly a reference to $2,500 and RAMIREZ-RIVERA requested the money be sent in the same manner it had previously been sent and indicated they did not have any money at the moment ("food in the fridge"). On April 30, 2019, at 9:50 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 391-0291 that contained a screenshot from Cash App that read, "Your $2,500 payment will be sent shortly." On April 30, 2019, at 9:51 p.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at (414) 779-1998 that read, "To which one Mano." On April 30, 2019, at 9:54 p.m., MARSHALL, using (414)

13

779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 391-0291 that read, "L." Case agents believe MARSHALL sent $2,500 to RAMIREZ-RIVERA for drugs previously received. RAMIREZ-RIVERA asked which account MARSHALL had sent the money to and MARSHALL replied "L," a reference to Luis Alberto Molina.

29.     On July 15, 2019, at 6:15 p.m., an iMessage was sent from (602) 703-0618 to (414) 779-1998 that read, "Mano call me." Case agents believe this was a new phone being used by Oscar Manuel RAMIREZ-RIVERA." On December 10, 2019, at 2:36 p.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage to (414) 779-1998 that contained a photo of two subjects, one of whom was Oscar RAMIREZ-RIVERA. Based on other iMessages, case agents are aware that RAMIREZ-RIVERA was arriving in Milwaukee that day. The photo appears to have been taken at General Mitchell International Airport in Milwaukee. Case agents believe RAMIREZ-RIVERA sent a photo of himself at the airport to tell MARSHALL he had arrived in Milwaukee. On February 22, 2020, at 5:42 p.m., MARSHALL, using (414) 779-1998, sent an iMessage to RAMIREZ-RIVERA at (602) 703-0618 that read, "HAPPY BIRTHDAY MANO!!! I'll call you in a few." Case agents are aware that Oscar RAMIREZ-RIVERA was born on February 22, 1992. For these reasons, case agents believe that Oscar RAMIREZ-RIVERA is the user of (602) 703-0618.

30.     On November 28, 2019, at 11:25 p.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage to MARSHALL at (414) 779-1998 that read, "Mano you put the old ready." On November 28, 2019, at 11:25 p.m., MARSHALL, using (414) 779-1998, sent an iMessage back to (602) 703-0618 that read, "Yup." On November 28, 2019, at 11:26 p.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage back to (414) 779-1998 that read, "Ok cool." On November 29, 2019, at 12:12 a.m., RAMIREZ-RIVERA, using (602) 703-0618,

14

sent an iMessage to MARSHALL at (414) 779-1998 that read, "Mano I need the name who send it." On November 29, 2019, at 12:12 p.m., MARSHALL, using (414) 779-1998 sent an iMessage to RAMIREZ-RIVERA at (602) 703-0618 that read, "Lemonda Ward." On November 29, 2019, at 12:12 a.m., RAMIREZ-RIVERA, using (602) 703-0618, sent an iMessage to MARSHALL at (414) 779-1998 that read, "For both." On November 29, 2019, at 12:47 a.m., MARSHALL, using (414) 779-1998, sent two iMessages to RAMIREZ-RIVERA at (602) 703-0618 that read, "Yup" followed by "1k each." Case agents believe RAMIREZ-RIVERA asked MARSHALL to send money to him using a prior method they used to send money ("put the old"). MARSHALL told RAMIREZ-RIVERA he had sent the money. RAMIREZ-RIVERA asked for the name of the person who sent the money and MARSHALL told him they were sent by Lemonda WARD, a known courier for the MARSHALL DTO. RAMIREZ-RIVERA asked if that was the sender for both wires and MARSHALL said it was and that each of the wires was for $1,000. Case agents believe this money was payment for drugs MARSHALL previously received from RAMIREZ-RIVERA.

31.     On June 11, 2020, a United States Postal Inspector was reviewing United States Postal Service ("USPS") business records when a Priority Mail parcel was found to be suspicious. The postal records indicated that a parcel had been shipped to "Jon Marshall" at 1929 South 97th Street, West Allis, Wisconsin. The Postal Inspector examined the USPS business records and open-source website information and determined that the parcel had been shipped from a company named "Kief Presses." A review of the website for Kief Presses, http://www.kiefpresses.com, revealed that the company manufactured and sold four different presses, which the company described as "pollen" presses. I am aware, based on my training and experience, that presses of this type are commonly used to compress powdered narcotics, such as

15

fentanyl, heroin, and cocaine, into compressed "bricks" after they have been diluted with cutting agents.

32.     A review of postal records revealed that the parcel shipped to Jonte MARSHALL from Kief Presses was being tracked from Jonte MARSHALL's residence at 8320 West Mourning Dove Court, Mequon, Wisconsin. An Administrative Subpoena previously served on Charter Communications revealed that the internet service at that residence was subscribed to Jonte MARSHALL with an email address of idtr_black@yahoo.com. That same day, MARSHALL was also due to receive another parcel from The Variety Shoppe, which case agents believe, based on the investigation to date, contained more lactose. That package had also been shipped to 1929 South 97th Street, West Allis, Wisconsin. Both parcels were delivered on Friday, June 12, 2020. Case agents believe that MARSHALL had purchased a press and additional quantities of a cutting agent in order to manufacture additional quantities of fentanyl, heroin, and/or cocaine, and to press those powders into "brick" form.

33.     On June 19, 2020, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the email address idtr_black@yahoo.com that was in possession of Yahoo!. On June 30, 2020, case agents received a response from Yahoo!. The response contained over 20,000 emails sent or received by MARSHALL from January 1, 2019, through June 19, 2020.

34.     Several of the emails revealed tracking updates from FedEx for parcels being sent from "John marshall, Blackout Investments LLC" on March 2, 2020; April 16, 2020; and May 19, 2020. Case agents are aware that Jonte MARSHALL is the registered agent for Blackout Investments LLC and that he frequently refers to himself as "John" in numerous emails. The March 2, 2020, parcel was sent to "Oscar Ramirez" at a FedEx Ship Center in Los Angeles,

16

California. The parcel was delivered on March 3, 2020, and was signed for by "O. Ramirez." The April 16, 2020, parcel was sent to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona. A review of public databases and social media information revealed that Oscar RAMIREZ-RIVERA shares several addresses and appears to be romantically involved with Mirna MATA. Public databases and social media information indicate that Mirna MATA has a brother named Luis MATA-TORRES. This parcel was delivered on April 17, 2020. The May 19, 2020, parcel was also addressed to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona. This parcel was delivered on May 20, 2020. Case agents believe these parcels contained payment to Oscar RAMIREZ-RIVERA for drugs previously received by MARSHALL.

35.     On June 17, 2020, case agents sent an Administrative Subpoena to FedEx Express for information on parcels sent using the FedEx account of "John marshall, Blackout Investments LLC." On July 7, 2020, case agents received records from FedEx. The records confirmed the three parcels described above. The records also indicated seven additional parcels had been sent to Luis MATA-TORRES and one parcel had been sent to Cindi MATA. All the parcels were delivered to addresses known to be associated with Mirna MATA and/or Oscar RAMIREZ-RIVERA or addresses that Oscar RAMIREZ-RIVERA had provided to Jonte MARSHALL via iMessage.

36.     On July 20, 2020, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed warrants authorizing the search of (414) 779-1998 and (602) 703-0618. More specifically, the warrants directed AT&T and T-Mobile to provide information about the location of (414) 779-1998 and (602) 703-0618 for a period of 45 days.

37.     Case agents monitoring the location of (602) 703-0618 observed that RAMIREZ-RIVERA had been primarily in the Phoenix, Arizona area until July 31, 2020. On July 31, 2020,

RAMIREZ-RIVERA travelled from Phoenix to Los Angeles, California. From July 31, 2020, until August 5, 2020, RAMIREZ-RIVERA remained in California and frequented the areas of Palmdale, California; Llano, California; and San Bernardino, California. On August 5, 2020, RAMIREZ-RIVERA returned to the Phoenix area. On Thursday, August 6, 2020, at 10:20 p.m., court-authorized positional information for (602) 703-0618 indicated that RAMIREZ-RIVERA was at the airport in Milwaukee, Wisconsin. RAMIREZ-RIVERA remained in the Milwaukee area and his phone was frequently observed at the same locations as MARSHALL's cellular phone.

38.     On August 12, 2020, at 8:50 a.m., court-authorized positional information for (602) 703-0618 indicated that RAMIREZ-RIVERA's cellular phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin. This is the location of Schweiger and Baumann Trucking LLC, a business owned by Jonte MARSHALL. At 9:01 a.m., court-authorized positional information for (414) 779-1998, MARSHALL's cellular phone, indicated MARSHALL was also in that area. At 9:20 a.m. and 9:35 a.m., (602) 703-0618 was located in close proximity to MARSHALL's residence at 8320 West Mourning Dove Court, Mequon, Wisconsin. At 9:18 a.m. and 9:36 a.m., (414) 779-1998 remained near 7836 North Faulkner Road. At 9:50 a.m., (602) 703-0618 was again in the area of 7836 North Faulkner Road. At 10:05 a.m., (602) 703-0618 was located in the area of North 76th Street and West Brown Deer Road which is between MARSHALL's residence and 7836 North Faulkner Road. At 10:07 a.m., (414) 779-1998 was located near his residence. At 10:20 a.m., (602) 703-0618 was located near North 76th Street and West Bradley Road which is approximately 13 blocks east of 7836 North Faulkner Road.

39.     At 10:25 a.m., case agents began to conduct surveillance at 7836 North Faulkner Road, Milwaukee, Wisconsin. At 10:25 a.m., case agents observed Jonte MARSHALL's black 2018 Cadillac Escalade, bearing Wisconsin license plates AGE-4015, parked in the southeast

18

corner of the rear parking lot at that location. These license plates list to Blackout Investments LLC at 7836 North Faulkner Road, Milwaukee, Wisconsin. Jonte MARSHALL is the registered agent for Blackout Investments LLC. Case agents also observed Jonte MARSHALL standing in the rear parking lot at that location. MARSHALL appeared to be taking a picture of a vehicle in a rear parking area. The vehicle could not be seen as it was parked between other large vehicles. Court-authorized positional information also confirmed that (414) 779-1998 was at that location at 10:25 a.m. Case agents established surveillance where they could observe vehicles coming and going from the business, but could not observe most of the rear parking lot.

40.     At 10:35 a.m., court-authorized positional information for (602) 703-0618 indicated it was located near 7836 North Faulkner Road. At 10:39 a.m., case agents observed a gray 2016 Jeep Grand Cherokee, bearing California license plates 8ADB961, drive from the rear parking lot and turn south on North Faulkner Road. These license plates list to Carlos ESTRADA at 13841 Beech Street, Victorville, California 92392. This vehicle was not followed. At 10:41 a.m., (414) 779-1998 was still located near 7836 North Faulkner Road. At 10:48 a.m., case agents observed Jonte MARSHALL walk across the rear parking lot and enter the driver's seat of his Cadillac Escalade. MARSHALL drove the Escalade out of the parking lot and turned north on North Faulkner Road. Case agents attempted to locate MARSHALL's vehicle, but were unsuccessful.

41.     At 10:49 a.m., court-authorized positional information for (602) 703-0618 indicated it was located near 7300 West Good Hope Road, Milwaukee, Wisconsin. Case agents went to that location in an attempt to locate RAMIREZ-RIVERA. At 10:58 a.m., case agents observed a commercial car carrier in the parking lot at approximately 7208 North 76th Street, Milwaukee, Wisconsin. Case agents observed a gray Jeep Grand Cherokee on the upper cargo

19

area of the car carrier and confirmed that the license plate on the Jeep was the same license plate of the Jeep observed leaving 7836 North Faulkner Road. Case agents were unable to locate RAMIREZ-RIVERA at that location and then began to conduct surveillance of the car carrier and Jeep.

42. Case agents maintained surveillance of the car carrier until it entered Interstate 94 eastbound toward Chicago, Illinois. The car carrier was followed into Racine County, Wisconsin. At 12:34 p.m., a Wisconsin State Patrol Inspector conducted a traffic stop of the car carrier for a safety inspection. After the initial traffic stop, the car carrier was relocated to the Racine Safety Weight Enforcement Facility for an inspection. The driver of the car carrier stated he had picked up all three of the vehicles on the car carrier from private parties in the Milwaukee area. The driver had shipping information on his phone which indicated the Jeep Grand Cherokee was being transported to Hesperia, California. The Inspector asked the driver to off-load the Jeep and one other vehicle so he could confirm the VIN numbers on each vehicle. The driver agreed to do so. A Wisconsin State Patrol Trooper then arrived on scene to assist the Inspector. The Trooper deployed his K-9 partner around the Jeep and the other vehicle and the K-9 alerted to the odor of controlled substances emanating from the Jeep. During a search of the Jeep, the Inspector and Trooper located an electronically-controlled compartment behind the rear passenger seat. The compartment was observed to contain rubber-banded United States currency. The Inspector and Trooper dismantled the compartment and removed a large amount of United States currency. An official count later revealed that $508,140 in United States currency was located in the compartment.

43. On August 12, 2020, the DEA Detroit Field Division contacted Milwaukee case agents regarding a telephone deconfliction. The Detroit agents had received information from a

20

source of information (SOI) related to the seizure of the currency from the Jeep Cherokee in Wisconsin and a possible future shipment of currency from Milwaukee. The SOI provided Detroit agents with specific information that Jonte MARSHALL and Oscar RAMIREZ-RIVERA planned to ship a second vehicle from Milwaukee on August 13, 2020. The SOI provided agents with the vehicle pickup location and a description of the vehicle.

44.     On August 13, 2020, Milwaukee case agents established surveillance at the vehicle pickup location, the same business owned by MARSHALL, located at 7836 North Faulkner Road, Milwaukee, Wisconsin. At 8:36 a.m., case agents observed a white Ford Expedition parked in the rear of the building. At 12:39 p.m., case agents observed the black Cadillac Escalade, bearing Wisconsin license plate AGE-3015, driven by MARSHALL, arrive at the business and park in the rear. At 12:41 p.m., court-authorized positional information for (414) 779-1998 revealed that the phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin. At 12:46 p.m., MARSHALL left the business northbound in the black Escalade. At 2:17 p.m., case agents observed a grey GMC Acadia, bearing Minnesota license plates DGA140, driven by a Hispanic male later identified as RAMIREZ-RIVERA arrive at the business and park in the rear. These license plates list to PV Holding Corporation, 2240 Airport Lane, Minneapolis, Minnesota 55450. PV Holding Corporation is a holding company for Avis and Budget rental cars. At 2:19 p.m., court-authorized positional information for (602) 703-0618 revealed that the phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin.

45.     At 5:41 p.m., case agents observed a commercial car carrier arrive at the business and park in front on North Faulkner Road. The company name "Gigi Line" was printed on the side of the truck. Shortly thereafter, RAMIREZ-RIVERA drove a white 2005 Ford Expedition, bearing Wisconsin license plates AFH-7134, from the rear of the business and turned the vehicle

21

over to the driver of the car carrier. These license plates list to Jonte MARSHALL at 1929 South 97th Street, West Allis, Wisconsin. This vehicle matched the description of the vehicle previously provided by the Detroit SOI. The driver loaded the Ford Expedition onto the car carrier while RAMIREZ-RIVERA watched.

46.     Agents conducted surveillance of the car carrier for approximately three hours as it picked up additional cars in West Bend, Wisconsin. After leaving that area, case agents followed the car carrier until it entered Interstate 94 toward Chicago, Illinois. At 9:43 p.m., as the car carrier was in Racine, County, Wisconsin, a traffic stop was conducted by the Wisconsin State Patrol. During the traffic stop and inspection, a Racine County Sheriff Deputy deployed his K-9, which gave a positive alert to the odor of controlled substances in the Ford Expedition. During a search of the vehicle, case agents located a large amount of US Currency concealed in a natural void in the driver's side rear quarter panel. An official count later determined that $100,020 had been seized from the vehicle.

47.     On August 31, 2020, case agents served a Grand Jury subpoena on Apple for information associated with any Apple accounts of Oscar RAMIREZ-RIVERA and phone number (602) 703-0618. On September 16, 2020, case agents received a response from Apple which identified the Apple ID **oscar22ramirez@icloud.com** as being assigned to Oscar RAMIREZ at phone number (602) 703-0618. The address associated with the account was 10620 West Illini Street, Tolleson, Arizona 85353-7674.

Case 2:20-mj-00401-SCD   Filed 09/17/20   Page 30 of 43   Document 1

## INFORMATION REGARDING APPLE ID AND iCLOUD[5]

25.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

26.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio or video calls.

c.     iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.     iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For

---

[5]     The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

       e.     Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

       f.     Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

       g.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

       h.     App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased

24

through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

27.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

28.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

29.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and

25

utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

30.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

31.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

26

32.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

33.     As detailed above, based on a review of phone records, along with physical and electronic surveillance, case agents believe Jonte MARSHALL and Oscar RAMIREZ-RIVERA are using Apple FaceTime and Apple iMessage to communicate with each other and with other DTO members. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

27

34.     Also as detailed above, Jonte MARSHALL has purchased cutting agents used to increase the volume of narcotics prior to distribution, from The Variety Shoppe. Information on the website of The Variety Shoppe indicates that an email will be sent to a customer upon shipment of the package. Therefore, case agents believe the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

35.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

36.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan

28

to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

37.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In this investigation, case agents have located bank accounts used by Jonte MARSHALL at at least three different banks. Case agents are aware that each of these banks offer a cellular phone application to allow users to access their accounts. The information connected to an Apple ID may assist in the identification of other bank applications used by MARSHALL. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

38.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

39.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

29

## CONCLUSION

40.     Based on the forgoing, I request that the Court issue the proposed search warrant.

41.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

42.     The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with Apple IDs : **idtr_black@yahoo.com** and **oscar22ramirez@icloud.com** (the "account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I.      **Information to be disclosed by Apple**

        To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

        a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

        b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

      c.      The contents of all emails associated with the account from January 1, 2019, through September 17, 2020, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

      d.      The contents of all instant messages associated with the account January 1, 2019, through September 17, 2020, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

      e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

      f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and

2

query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.     All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.     All records pertaining to the types of service used;

i.     All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.     All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses involving Jonte MARSHALL, Lemonda WARD, Shomari HOOPER, and Oscar RAMIREZ-RIVERA since January 1, 2019, including, for each account or identifier listed on Attachment A, information pertaining to the following matters: the sale of illegal drugs and the laundering of proceeds of drug sales.

The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

a.     Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

b.     Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

c.     Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

d.     Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

4